**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 11, 2024

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 11, 2024

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| TERRY COUSINS, | ) | No. 101769-3 |
| Petitioner, | ) | |
| v. | ) | En Banc |
| STATE OF WASHINGTON and DEPARTMENT OF CORRECTIONS, | ) | Filed: <u>April 11, 2024</u> |
| Respondents. | ) | |

YU, J. — This case concerns Terry Cousins' efforts to obtain public records pertaining to her sister, who died in the custody of the Department of Corrections (DOC). Cousins commenced this action in January 2021, alleging that DOC's response to her public records request violated the Public Records Act (PRA), ch. 42.56 RCW. We must decide whether Cousins' PRA action is barred by the one-year statute of limitations, RCW 42.56.550(6). The answer is no. In accordance with *Belenski v. Jefferson County*, 186 Wn.2d 452, 378 P.3d 176 (2016), we hold that the limitations period did not start running until DOC issued its final "closing letter" in June 2021.

*Belenski* holds that the PRA's one-year limitations period starts to run when an agency provides its "final, definitive response" to a PRA request. *Id.* at 462. A sufficient closing letter from an agency can, and usually will, satisfy *Belenski*'s final, definitive response test. However, an agency's use of the word "closed" is not determinative. Instead, a closing letter must be objectively "sufficient to put [a nonattorney requester] on notice" that the one-year limitations period had started running because the agency does "not intend to disclose records or further address [the] request." *Id.* at 461. To assess the sufficiency of a closing letter, courts and agencies should consult the attorney general's advisory model rules on public records compliance (Advisory Model Rules), ch. 44-14 WAC, and the guidance provided in today's opinion.

Here, DOC produced multiple installments of records responsive to Cousins' PRA request and then sent Cousins a letter in January 2019 stating that her request was "now closed" (January 2019 closing letter). Clerk's Papers (CP) at 44. The January 2019 closing letter properly invited Cousins to ask follow-up questions, as all closing letters should do. *See* WAC 44-14-04006(1). Cousins promptly asked about specific records she believed were missing, and she repeatedly followed up when DOC initially failed to fully answer her questions. Eventually, DOC reopened Cousins' original PRA request to conduct an additional search, leading to the production of hundreds of pages of previously undisclosed responsive records,

2

followed by a *second* letter stating that the request was "now closed" in June 2021 (June 2021 closing letter). CP at 1440.

DOC argues that the January 2019 closing letter was its final, definitive response, making Cousins' PRA action untimely. On this record, we cannot agree. Instead, we hold that the June 2021 closing letter was DOC's final, definitive response to Cousins' PRA request.

DOC was certainly not required to reopen Cousins' PRA request after issuing the January 2019 closing letter. Indeed, after issuing a sufficient closing letter, an agency may choose to answer follow-up questions by simply reiterating that the statute of limitations has started running because the agency does not intend to further address the request. In this case, however, DOC selected a different course of action. First, when Cousins timely asked questions following the January 2019 closing letter, DOC chose to provide a partial, ambiguous answer that was not sufficient to put Cousins on notice that DOC did not intend to further address her request. As a result, the January 2019 closing letter failed to provide Cousins with a final, definitive response to her PRA request.

When Cousins persisted in her efforts to communicate with DOC, DOC ultimately chose to reopen her original PRA request, conduct an additional search, and produce additional responsive records before closing the request again in June 2021. This second and final closing letter was DOC's final, definitive response,

triggering the PRA's one-year limitations period in accordance with *Belenski*.

Records produced after the June 2021 closing letter may be relevant to DOC's

liability or penalties, but they did not restart the limitations period.

Thus, Cousins' PRA action is not barred by the statute of limitations. We

decline to reach her alternative argument regarding the discovery rule of accrual,

and we reject DOC's alternative argument that Cousins' action must be dismissed

as premature. We reverse and remand to the trial court for further proceedings.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Because the issues in this case are heavily fact dependent, it is necessary to

provide a detailed timeline. This case is before us on DOC's motion for summary

judgment, and the facts are undisputed except where noted otherwise. We

"construe the facts in the light most favorable to [Cousins,] the nonmoving party."

*Sanders v. State*, 169 Wn.2d 827, 845, 240 P.3d 120 (2010).

A.     Renee Field's death in DOC custody

This case begins with the death of Cousins' sister, Renee Field, in DOC

custody. In January 2016, Field experienced "sudden-onset neck and head pain"

and later developed "visual changes and right side numbness." CP at 472, 481.

However, she was never given "a comprehensive evaluation by a physician or

advanced practitioner." *Id.* at 475.

On March 6, 2016, Field experienced a severe headache with "shooting pain on the right side of the head and neck." *Id.* at 473. She was given medication and sent "back to her living unit in a wheelchair because she was unable to walk." *Id.* at 481. Overnight, Field fell out of bed and had a seizure. Instead of calling an ambulance, a DOC physician assistant transferred Field to a different corrections facility. Field arrived there in a state of medical emergency, and staff called 911. Field was taken by ambulance to an outside hospital where doctors attempted surgery, but she "died on March 14, 2016 . . . from a ruptured aneurysm, a stroke, hydrocephalus, and respiratory failure." *Id.* at 482.

Following an investigation, the Office of Corrections Ombuds concluded that the medical care Field received from DOC "did not meet community healthcare standards, and her death could have been prevented." *Id.* at 475. The Washington Medical Commission also imposed sanctions against the DOC physician assistant for "contribut[ing] to [Field's] death." *Id.* at 487.

B.    Cousins' PRA request to DOC

1.    Request, initial response, and production of first two installments

Cousins is the personal representative of Field's estate. On July 21, 2016, Cousins submitted a PRA request to DOC through counsel, seeking "[a]ny and all records regarding Renee A. Field . . . from January 1, 2014 to present." *Id.* at 36. The request was assigned to Public Records Specialist Gaylene Schave.

On July 25, 2016, Schave e-mailed Cousins a tracking number for her PRA request, PDU-43037,[1] and explained that Field's medical and chemical dependency records would be processed separately in their respective departments rather than DOC's centralized public records unit. Schave told Cousins to expect additional correspondence by October 11, 2016. Meanwhile, the medical and chemical dependency departments reviewed their records, producing the medical records in August 2016 and the chemical dependency records in February 2017.

In late September 2016, Cousins' PRA request was reassigned to Public Records Specialist Sheri Izatt. On October 28, Izatt sent a cost bill for the first installment (Installment 1). Cousins' counsel asked to cancel the PRA request, which Izatt confirmed. However, the following week, counsel e-mailed to "re-open" the request and asked Izatt to communicate directly with Cousins. *Id.* at 40. Izatt responded that the records would be released when the costs were paid. On November 15, Cousins e-mailed Izatt to confirm that she was sending payment, and asked to verify that her PRA request included "video or audio recordings" from the corrections facilities. *Id.* at 1274. Izatt did not respond.

Cousins sent payment, and DOC sent Installment 1 to her on November 22, 2016. Izatt promised further correspondence by February 28, 2017, but later

---

[1] The record variously refers to this request as "PRU-43037," "16-43037," "PDU-43037," and "P-43037." CP at 44, 586, 1256, 1444.

extended the deadline. New counsel appeared on Cousins' behalf in early February, and Izatt later sent counsel a cost bill for the next installment. Cousins paid the bill, and Installment 2 was produced on April 17, 2017. At this point, her PRA request had been pending for approximately nine months.

2. Cousins notifies DOC that specific records are allegedly missing

Upon reviewing Installments 1 and 2, Cousins came to believe that some records were missing, such as e-mail attachments. On May 24, 2017, Cousins e-mailed Izatt through counsel with a list of documents that "appear to have been omitted from the first and second installment of records," including specific reports, letters, and attachments that were referenced in other records but had not been produced.[2] *Id.* at 491. The May 2017 e-mail explicitly stated, "To the extent any of the requested records is not covered by our current public records request, Tracking No. PDU-43037, *please consider this letter our formal public records request seeking those records*." *Id.* at 492 (emphasis added).

There is no indication that DOC opened a new PRA request for the allegedly missing records. Instead, Izatt responded that Cousins' original PRA "request [was] still open" and that DOC was "still in the process of gathering records." *Id.* at 499. Izatt further explained that "e[-]mails were maintained via hardcopy and

---

[2] The merits of Cousins' PRA action are not before us. We express no opinion as to whether, or when, these allegedly missing records should have been produced.

7

did not maintain the attachments," but she promised that responsive records "will be in future installments." *Id.* at 500.

3.      Additional installments and January 2019 closing letter

Over the next 14 months, DOC produced Installments 3 through 6.  In October 2017, between Installments 3 and 4, Cousins asked Izatt to communicate directly with her again rather than through counsel.  Thereafter, Izatt worked directly with Cousins, but DOC's internal file for Cousins' PRA request continued to list Cousins' former counsel as the sole requester.  By the time Installment 6 was produced in September 2018, Cousins' PRA request had been pending for over two years.  DOC still had not produced any of the allegedly missing records Cousins had identified in May 2017.

On October 31, 2018, Izatt sent Cousins a cost bill for Installment 7.  Cousins timely sent payment, but her check was never cashed.  On December 10, Izatt entered a notation in DOC's internal file that the request was closed for nonpayment.  Unaware of the closure, Cousins e-mailed Izatt to ask about Installment 7.  When Izatt responded that the costs had not been paid, Cousins promptly re-sent the payment, as directed by Izatt.  DOC received Cousins' payment and produced Installment 7 on January 17, 2019.

Installment 7 included a cover letter from Izatt explicitly stating that Cousins' payment "was received on January 14, 2019." *Id.* at 44.  However, Izatt

never updated DOC's internal file with this information. As a result, the internal file continued to state that Cousins' request was closed for nonpayment in December 2018, with no subsequent entries until July 2020. In deposition, Izatt said that she "forgot" to update DOC's internal file but suggested that it was unimportant because it was "just notes to other staff." *Id.* at 561. In fact, as discussed below, the inaccuracies in DOC's internal file concerning the identity of the requester and Cousins' payment history caused significant confusion for the records specialist who took over after Izatt, to Cousins' detriment.

The final line of Izatt's cover letter for Installment 7 states, "PRU-43037 is now closed. However, if you should have any questions related to this request, you may contact me at the address below (or via e-mail . . .)." *Id.* at 44. According to DOC, this January 2019 closing letter was its final, definitive response to Cousins' PRA request. The letter did not explain why DOC had closed the request or, indeed, what it meant for a request to be "closed."

Cousins thought the January 2019 closing letter reflected DOC's view that it "had found all responsive records to [her] request," which Cousins believed was a mistake because DOC had not yet addressed the allegedly missing records she had identified in May 2017. *Id.* at 105. Relying on the letter's explicit invitation to ask questions, Cousins e-mailed Izatt.

4. Cousins promptly asks DOC about the allegedly missing records

On January 22, 2019, five days after the closing letter, Cousins e-mailed Izatt to ask about (1) Field's medical and chemical dependency records and (2) the allegedly missing records she had identified in May 2017. Izatt responded that she would look into the medical and chemical dependency records but did not address Cousins' second question about the allegedly missing records. Cousins promptly sent a follow-up e-mail, asking again about the "specific reports that [she] requested *in addition to* the medical or chemical dependency records," with the May 2017 e-mail included for reference. *Id.* at 594 (emphasis added).

The next day, January 23, Izatt e-mailed Cousins the dates on which the medical and chemical dependency records had been produced. Once again, Izatt failed to address the allegedly missing records. Izatt did restate the language of Cousins' "initial request" from July 2016, but this was not responsive to Cousins' question. *Id.* As discussed above, Izatt had assured Cousins that the allegedly missing records identified in May 2017 would be produced in "future installments" of her original PRA request, "PDU-43037." *Id.* at 500.

Cousins sent another follow-up e-mail, reiterating that she sought "the specific documents [she] requested after the second installment." *Id.* at 593. Izatt did not respond. On February 1, Cousins e-mailed Izatt again, explaining that she

10

had been waiting nearly three years for her request to be fulfilled. In response, Izatt re-sent her e-mail from January 23.

Because Izatt had answered Cousins' question about the medical and chemical dependency records, but had not yet addressed the allegedly missing records, Cousins believed that she and Izatt were still "conversing about what records were missing and where they were." *Id.* at 1525. Moreover, based on the gaps in communication and delays in production for Installments 1 through 7, described above, Cousins believed that Izatt's failure to promptly respond indicated that Izatt was looking into the allegedly missing records. However, Cousins never heard from Izatt again.

Izatt ended her employment with DOC in April 2019. Cousins e-mailed Izatt again in October 2019, but no one responded. Cousins asserts that she did not even receive an automated reply stating that Izatt's e-mail account had been disabled, although DOC disputes this. Cousins also called DOC's public records unit and left voice messages twice. *Id.* at 117 (October 24, 2019, at 10:59 AM), 118 (October 25, 2019, at 4:11 PM).

On October 29, 2019, Public Records Specialist Paula Terrell responded to Cousins' voice messages by e-mail. Terrell told Cousins that she was not the requester based on the inaccurate information in DOC's internal file, which continued to list Cousins' former counsel as the sole requester. Cousins responded

11

immediately, providing a detailed timeline of her former attorneys and urging Terrell to "[p]lease check [her] records." *Id.* at 62.

The following week, Terrell re-sent the January 2019 closing letter and told Cousins that "[t]his request is and remains closed." *Id.* Cousins responded that she already had the January 2019 closing letter, but no one had answered her follow-up questions about the allegedly missing records identified in May 2017. Without addressing those records, Terrell invited Cousins to "respond with any questions [she] may have regarding [her] closed public records request, PRU-43037." *Id.* Terrell did not explain why the request was closed, what it meant for a request to be "closed," or what Cousins could hope to accomplish by asking about allegedly missing records in a closed request.

On November 14, 2019, Cousins e-mailed Terrell a list of outstanding items, including the allegedly missing records she had identified in May 2017. Relying on the inaccurate information in DOC's internal file, Terrell responded that Cousins' PRA request "was closed due to [DOC] not receiving payment" for Installment 7. *Id.* at 65. As explained above, Cousins had, in fact, made payment, but Izatt never updated DOC's internal file with this information.

Because Cousins knew she had paid for, and received, Installment 7, she e-mailed Terrell again in "disbelief." *Id.* at 1537. Cousins reiterated that her PRA request "was closed due to [DOC's] assumption that [her] request was completely

filled," which Cousins believed was incorrect because she had "not received all of the records as stated in [her] earlier e[-]mail." *Id.* at 65. Terrell never responded. In deposition, Terrell did not explain why she stopped communicating, saying only that there was a "lapse" in "responding to [Cousins] and reopening the request." *Id.* at 571. Terrell admitted that she should have reopened the request at that time, and she could not recall why she did not do so.

Cousins believed Terrell was still working on her PRA request because Cousins had thoroughly explained the situation and answered all of Terrell's questions, and Terrell "did not come back and say no, I'm not working on it." *Id.* at 1540. Nevertheless, according to DOC, the PRA's one-year limitations period expired in January 2020 while Cousins waited for a response to the questions Terrell had explicitly invited her to ask.

5. DOC reopens Cousins' original PRA request

When Terrell failed to respond, Cousins e-mailed her again in July 2020, using the same e-mail thread from November 2019. At this point, Terrell finally realized that she was mistaken in thinking that Cousins' PRA request had been closed for nonpayment. Moreover, after reviewing the file, Terrell believed that there had been "a misunderstanding" between Cousins and Izatt in January 2019, and that Cousins' PRA request should be reopened. *Id.* at 581.

13

According to DOC's internal file, Terrell "re-opened" Cousins' original PRA request ("16-43037") on July 15, 2020, to "conduct an additional search." *Id.* at 590, 586. That same day, Terrell e-mailed Cousins to verify the records she was seeking. Cousins verified the list of records and, on July 30, Terrell confirmed that responsive records would be provided pursuant to Cousins' original request, "PRU-43037." *Id.* at 548. Terrell cautioned that if Cousins had "additional records to add to this request, it may be that we treat those additional requested records as a new request," but Cousins promptly clarified that this was *not* "a new request for 'additional' documents." *Id.* at 551, 1380. Terrell admitted in deposition that the records were not new and that they should have been "included in [the] any and all requests that [Cousins] originally did in 2016." *Id.* at 580.

On August 26, 2020, Terrell sent the list of records to DOC staff, using the subject line "PDU-43037 records request."[3] *Id.* at 727. From August 2020 to June 2021, staff actively searched for and successfully located numerous responsive records, including some of the records that Cousins had identified in May 2017. In October 2020, DOC produced "Installment #8 of PRU-43037," followed by Installments 9 and 10 in November and December, respectively. *Id.* at 1402.

---

[3] On the same day, a different records specialist allegedly opened "a new request" with "a new and different tracking number," which Cousins disputed "[b]ecause it wasn't a new request." CP at 6, 1541. There is no indication that DOC followed up on this "new" request.

C.    Cousins commences her PRA action while DOC continues producing
records

In January 2021, after receiving Installment 10, Cousins filed a complaint

against the State of Washington and DOC, alleging "denial of access to public

records without justification or exemption, intolerable delay, a failure to conduct

an investigation to identify responsive records, and a lack of any explanation as to

why these public records continue to be withheld." *Id.* at 7-8.  DOC filed its

answer in February 2021, asserting the statute of limitations as an affirmative

defense.  While Cousins' lawsuit was pending, DOC continued searching for

records, producing Installments 11 through 15 from February to May 2021.

On June 23, 2021, DOC produced Installment 16, which included over 300

pages of previously undisclosed responsive records bearing the notation, "Printed:

8/30/2016 11:45:02 AM." *Id.* at 120-425.  According to Izatt, these documents had

likely been "waiting in the queue to be reviewed somewhere in the records office"

since the August 2016 print date. *Id.* at 562.  She could not explain why they were

not produced earlier.

Installment 16 was accompanied by a cover letter stating, "This public

records request, PDU-43037[ ]is *now* closed" (June 2021 closing letter). *Id.* at

1440 (emphasis added).  Cousins' litigation counsel e-mailed counsel for DOC,

asserting that specific responsive records had not been produced.  "[I]n an attempt

to address [the] concerns regarding this request . . . without waiving any argument

in the ongoing litigation," DOC produced "[I]nstallment #17" in August 2021, with a cover letter stating that "P-43037 remains closed." *Id.* at 1444. DOC's own filings state that Installments 8 through 17 included hundreds of pages of previously undisclosed responsive records. *See id.* at 1493-1517.

D.     Summary judgment and appeal

In September 2021, one month after producing Installment 17, DOC moved for summary judgment based on the statute of limitations. DOC acknowledged that it "did reopen [Cousins'] request and provide additional installments" starting "[i]n the summer of 2020." *Id.* at 94. Nevertheless, DOC argued that "[a]ny PRA claims accrued when the request was closed" in January 2019, and its subsequent "production of additional records does not change the result." *Id.* at 96-97. In support of its motion, DOC relied heavily on *Dotson v. Pierce County*, 13 Wn. App. 2d 455, 464 P.3d 563, *review denied*, 196 Wn.2d 1018 (2020).

*Dotson* was the first published appellate opinion to apply the final, definitive response test this court adopted in *Belenski*. Like DOC in this case, the agency in *Dotson* produced responsive records, then sent the requester a letter "'closing'" her PRA request. *Id.* at 461 (quoting record). However, unlike DOC, the agency in *Dotson* specified *why* the request was being closed, stating that the requester had "'received responsive documents.'" *Id.* (quoting record). In addition, unlike

16

Cousins, the requester in *Dotson* did not ask any "questions regarding the produced records or amend her PRA request" in response to the closing letter. *Id.* at 462.

Several months later, the agency in *Dotson* discovered additional responsive records in the ordinary course of business and provided them to the requester. *Id.* at 462-63. The requester filed a PRA action less than one year after the additional records were provided but more than one year after the closing letter. *Id.* at 462. The Court of Appeals held that the action was time barred, reasoning that the closing letter was the agency's final, definitive response because it sufficiently "alert[ed] Dotson that there would be no forthcoming documents." *Id.* at 471.

Here, DOC argued that Cousins' case was "[j]ust like" *Dotson*. CP at 96. Therefore, according to DOC, the PRA's one-year limitations period started running with the January 2019 closing letter, notwithstanding the subsequent production of Installments 8 through 17. Cousins opposed summary judgment, urging the trial court to distinguish *Dotson* or, alternatively, to apply equitable tolling. Cousins also moved for a show cause hearing on the merits of her PRA claims. *See* RCW 42.56.550(1)-(2). Following oral argument, the trial court granted summary judgment to DOC, ruling that the decision was "constrained by established case[ ]law, specifically the Court of Appeals' decision in *Dotson*." CP

17

at 1802.  The trial court further declined to apply equitable tolling, denied Cousins'

show cause motion as moot, and dismissed her PRA action.[4]

Cousins appealed, arguing that *Dotson* was both factually distinguishable

and incorrectly decided.  Alternatively, Cousins argued that her PRA action was

timely filed in accordance with the discovery rule of accrual.  She did not appeal

the trial court's decision denying equitable tolling.  DOC urged the appellate court

to affirm the trial court's ruling on the statute of limitations or, in the alternative, to

affirm dismissal on the basis that Cousins' action was premature.

The Court of Appeals affirmed in a split, published opinion.  *Cousins v.*

*Dep't of Corr.*, 25 Wn. App. 2d 483, 523 P.3d 884 (2023).  The majority

interpreted *Belenski* to establish a "bright line rule" that the PRA's limitations

period is always triggered when an agency tells a requester "that the request is

closed."  *Id.* at 493.  Acknowledging "that the facts here are different than in

*Dotson*," the majority nevertheless held that "the different facts do not change the

result."  *Id.* at 492-93.  The majority also declined to apply the discovery rule of

accrual.  *Id.* at 495.  A partial dissent rejected "[t]he majority's bright line rule,"

---

[4] In an oral ruling, the trial court appeared to address the underlying merits of Cousins' PRA claims.  *See* CP at 1794.  However, counsel asked to confirm that "the Court did not reach the actual merits," and the trial court agreed.  *Id.* at 1796.  The written order did not reach the merits, instead denying Cousins' show cause motion "as moot."  *Id.* at 1802 (capitalization omitted).  "[I]n the event of a conflict, a written order will control over an oral ruling."  *State v. Sims*, 193 Wn.2d 86, 99, 441 P.3d 262 (2019).  Therefore, the merits of Cousins' PRA action were not decided by the trial court and are not before us on review.  The record also references a "Motion to Strike," but that motion is not in the record, so we do not address it.  CP at 1800.

arguing that the "drastically different facts" presented in Cousins' case "warrant a different result" and warning that the majority "creates incentives that are contrary to the purpose of the [PRA]." *Id.* at 499 (Glasgow, C.J., dissenting in part).

Cousins petitioned for review, asking this court to distinguish or overrule *Dotson* or, in the alternative, to adopt the discovery rule of accrual for PRA actions. We granted review without limitation and accepted two joint amici briefs, one supporting Cousins and the other supporting DOC.[5]

## ISSUES

A.      When does an agency letter "closing" a PRA request trigger the one-year statute of limitations in RCW 42.56.550(6)?

B.      Is Cousins' PRA action barred by the one-year statute of limitations?

C.      If Cousins' PRA action is not barred by the statute of limitations, should dismissal be affirmed on the alternative basis that the action is premature?

## ANALYSIS

This case requires us to interpret the statute of limitations for seeking judicial review of agency actions in PRA cases. The statute provides, "Actions under this section must be filed within one year of the agency's claim of exemption

---

[5] Cousins is supported by the American Civil Liberties Union of Washington, the Human Rights Defense Center, the Washington Coalition for Open Government, Columbia Legal Services, and the Washington Employment Lawyers Association. DOC is supported by the Washington State Association of Municipal Attorneys, the Washington Association of County Officials, and the Washington Association of Prosecuting Attorneys.

or the last production of a record on a partial or installment basis." RCW 42.56.550(6). When interpreting the PRA, "[o]ur review is de novo." *Rental Hous. Ass'n of Puget Sound v. City of Des Moines*, 165 Wn.2d 525, 536, 199 P.3d 393 (2009) (citing RCW 42.56.550(3)).

The PRA has included a statute of limitations since its original enactment in 1973, and the language of the current statute has not changed since 2005. LAWS OF 1973, ch. 1, § 41; LAWS OF 2005, ch. 483, § 5(6). However, this court has interpreted it only twice, first in 2009 with *Rental Housing*, 165 Wn.2d 525, and later in 2016 with *Belenski*, 186 Wn.2d 452. Therefore, we take this opportunity to further develop our precedent and to address, as a matter of first impression, whether an agency's "closing letter" may trigger the PRA's limitations period.

DOC supports the bright-line rule adopted by the Court of Appeals' majority, which holds that the statute of limitations *always* starts running "when an agency notifies the requester that the request is closed." *Cousins*, 25 Wn. App. 2d at 485. Cousins argues that the statute of limitations should *never* start running with "an agency's 'closing' of a request," particularly "where the agency later produces responsive records." Am. Pet. for Discr. Rev. at 2. DOC emphasizes the importance of certainty and finality, while Cousins emphasizes the PRA's strong mandate for broad disclosure of public records. Our task is to balance these

important, and sometimes competing, interests by "determin[ing] and enforc[ing] the intent of the legislature." *Rental Hous.*, 165 Wn.2d at 536.

We hold that a sufficient closing letter will generally trigger the PRA's statute of limitations; the subsequent production of records may be relevant to liability or penalties but ordinarily will not restart the limitations period. However, to trigger the limitations period, a closing letter must be *sufficient*; an agency's use of the word "closed," without more, is not determinative. Instead, the closing letter must satisfy *Belenski*'s final, definitive response test in accordance with the attorney general's Advisory Model Rules and the guidance provided in today's opinion. An insufficient or premature closing letter may not trigger the limitations period at all or it may provide a basis for equitable tolling.

A closing letter is sufficient if it provides at least the following information to the requester, in plain language targeted to a lay audience: (1) how the PRA request was fulfilled and why the agency is now closing the request, (2) that the PRA's one-year statute of limitations to seek judicial review has started to run because the agency does not intend to further address the request, and (3) that the requester may ask follow-up questions within a reasonable time frame, which may be specified by the agency. If the requester asks timely follow-up questions, the agency is not required to search for additional records, although it may choose to do so. However, if the agency does not intend to further address the request, it

must explicitly say so and reiterate that the statute of limitations has started to run. The final, definitive response test is an objective inquiry, so the agency's subjective intent and the requester's subjective understanding are not relevant.

In this case, DOC sent Cousins a purported "closing letter" in January 2019. However, when Cousins asked timely follow-up questions, DOC initially chose to ignore one of her questions, creating ambiguity as to whether Cousins' PRA request was still being processed. As a result, the January 2019 closing letter was not DOC's final, definitive response to Cousins' PRA request. DOC later chose to reopen Cousins' original PRA request and produce additional records before closing the request again in June 2021. Therefore, we hold that the June 2021 closing letter was DOC's final, definitive response triggering the one-year limitations period. Cousins' PRA action is not barred by the statute of limitations.[6]

A.    A sufficient closing letter that satisfies *Belenski*'s final, definitive response test will ordinarily trigger the PRA's limitations period

To resolve the issues before us, it is first necessary to review our precedent interpreting the PRA's statute of limitations. Although our precedent is limited, it reflects a consistent effort to balance the interests of certainty and finality with the PRA's strong mandate for public disclosure, culminating in our adoption of *Belenski*'s final, definitive response test. We affirm that *Belenski* provides the

---

[6] In light of this holding, we need not reach Cousins' alternative argument regarding the discovery rule of accrual, and we decline to do so.

22

correct analytical framework for all PRA cases, and we largely affirm *Dotson*'s application of *Belenski* to the closing letter in that case, with certain clarifications. However, *Dotson* did not adopt, and we decline to recognize, a bright-line rule that *Belenski* is necessarily satisfied by the word "closed." Instead, an agency's closing letter will trigger the PRA's limitations period if, *but only if*, the letter satisfies the final, definitive response test in accordance with the attorney general's Advisory Model Rules and the guidance provided in today's opinion.

     1.     Overview of this court's precedent

Guided by legislative intent, our precedent interpreting RCW 42.56.550(6) has sought to balance the "theme of finality" reflected in the statute of limitations with the PRA's "strongly-worded mandate for broad disclosure of public records." *Belenski*, 186 Wn.2d at 460; *Rental Hous.*, 165 Wn.2d at 535. Most recently, this balanced approach led us to adopt *Belenski*'s "final, definitive response" test. 186 Wn.2d at 462. The same balanced approach guides our decision today.

We first interpreted the PRA's statute of limitations in *Rental Housing*. There, an agency "refused to provide hundreds of pages" of records, asserting various exemptions. 165 Wn.2d at 528. However, the refusal letter "did not describe individual documents and did not provide a privilege exemption log." *Id.* at 529. The requester asked for "a privilege log specifically describing each

withheld individual document and the basis for withholding," which the agency "attempted to provide" six months later. *Id.* at 529, 533.

The requester in *Rental Housing* commenced a PRA action more than one year after the agency's initial refusal letter but less than one year after the agency sent the privilege log. *Id.* at 533-34. The agency moved to dismiss, arguing that the limitations period started running from the initial refusal letter because that letter made a "claim of exemption" as contemplated by the statute. *Id.* at 534-36; *see* RCW 42.56.550(6).

*Rental Housing* rejected the agency's position. Instead, we considered the statutory language, prior case law, and relevant regulations to conclude that "a claim of exemption requires a detailed privilege log." *Rental Hous.*, 165 Wn.2d at 536. However, we did not treat the words "privilege log" as conclusive. Instead, we looked to the record to determine whether the agency's initial refusal letter *functioned* as "a valid claim of exemption" by "includ[ing] the sort of 'identifying information' a privilege log provides." *Id.* at 538 (quoting *Progressive Animal Welfare Soc'y v. Univ. of Wash*, 125 Wn.2d 243, 271 n.18, 884 P.2d 592 (1994) (plurality opinion)). We concluded that the refusal letter "was insufficient to constitute a proper claim of exemption and thus did not trigger the one-year statute of limitations." *Id.* at 539.

Thus, *Rental Housing* took a functional approach to balance the interests at stake. The agency argued that this approach would "undermine[ ] the public policy favoring statutes of limitation," including "certainty and finality, and protecting against stale claims." *Id.* at 540. However, we held these interests were better served by "liberally construing the PRA to effectuate open government—as we must." *Id.*; *see* RCW 42.56.030.

We next considered the statute of limitations in *Belenski*. On its face, the PRA's statute of limitations lists only two types of agency responses: (1) "the agency's claim of exemption" or (2) "the last production of a record on a partial or installment basis." RCW 42.56.550(6). However, the agency in *Belenski* responded differently, asserting that it had "'no responsive records.'" 186 Wn.2d at 455 (quoting record). The requester sued two years later, after learning that responsive records did exist, but the agency believed it "need not provide them." *Id.* Thus, we were asked to determine "the appropriate starting point for the statute of limitations when an agency's response does not fall strictly within the two types of responses listed in RCW 42.56.550(6)." *Id.* at 459.

The requester argued that the PRA's limitations period starts running *only* when the agency provides one of the "two very specific agency responses" listed in the statute. *Id.* *Belenski* rejected this interpretation because "there are many other ways an agency may respond, whether permitted under the statute or not." *Id.*

Instead, *Belenski* considered the broader language and purposes of the PRA to conclude that the agency responses listed in the statute are illustrative examples, not a "definitive list." *Id.* at 460. Therefore, we held "that the legislature intended to impose a one year statute of limitations beginning on an agency's final, definitive response to a public records request," even where the agency's response does not strictly fit within the statutory language. *Id.*

Based on the specific facts presented, *Belenski* held the agency's assertion that it had no responsive records constituted a "final, definitive response" because it "was sufficient to put [the requester] on notice that the [agency] did not intend to disclose records or further address this request." *Id.* at 461. Even if the agency's answer was not "truthful or correct," it could trigger the statute of limitations because, if the requester "was unsatisfied with this answer, he could sue . . . as soon as [the agency] gave this response." *Id.* In this way, *Belenski* effectuated the legislature's intent to establish a "theme of finality . . . for all possible responses under the PRA, not just the two expressly listed in RCW 42.56.550(6)." *Id.* at 460.

Nevertheless, *Belenski* recognized "legitimate concerns" that giving conclusive effect to an agency's "dishonest response" could be "fundamentally unfair in certain circumstances." *Id.* at 461. Such an approach "could incentivize agencies to intentionally withhold information and then [attempt to] avoid liability due to the expiration of the statute of limitations . . . contrary to the broad

disclosure mandates of the PRA." *Id.* Therefore, to balance the legislature's dual interests in finality and broad public disclosure, *Belenski* remanded to the trial court "to determine whether the doctrine of equitable tolling applies to toll the statute of limitations in this case." *Id.* at 462.

*Belenski* and *Rental Housing* are certainly "distinguishable" from each other on the facts and issues presented. *Id.* at 461 n.2. Nevertheless, both opinions balanced the PRA's strong mandate for broad public disclosure with the need for certainty and finality in PRA actions. The result of this balanced approach was *Belenski*'s final, definitive response test. We take the same approach in resolving the issues now before us.

2. *Dotson* does not adopt a bright-line rule that all purported "closing letters" automatically trigger the PRA's limitations period

Neither *Rental Housing* nor *Belenski* considered whether, or under what circumstances, an agency's "closing letter" may trigger the PRA's statute of limitations. The seminal case addressing that question is the Court of Appeals' opinion in *Dotson*, 13 Wn. App. 2d 455, which is central to the parties' arguments in this case. The parties interpret *Dotson* to create a bright-line rule that the PRA's limitations period is automatically triggered whenever an agency issues a purported "closing letter." We cannot agree with the parties' interpretation of *Dotson*, and we take this opportunity to clarify *Dotson*'s holdings.

*Dotson* primarily addressed an issue that was left open by this court's opinion in *Belenski*. As discussed above, *Belenski* adopted the final, definitive response test in the context of "an agency's response [that] does not fall strictly within the two types of responses listed in RCW 42.56.550(6)." 186 Wn.2d at 459. *Belenski* further suggested, albeit in dicta, that the same analysis should apply in all PRA cases because it would be "absurd" to apply different statutes of limitations "based on how the agency responded." *Id.* at 460-61. This dicta from *Belenski* was directly at issue in *Dotson*.

As discussed above, the agency in *Dotson* produced records responsive to a PRA request, issued a letter closing the request, and then subsequently produced additional records that were inadvertently discovered in the ordinary course of business. The question was whether the limitations period started to run with the closing letter (as the agency argued) or with the agency's subsequent production of the "last installment of responsive records" (as the requester argued). *Dotson*, 13 Wn. App. 2d at 470. The requester pointed to "the plain language" of the statute of limitations and argued that *Belenski* "controls only where RCW 42.56.550(6) does not clearly apply." *Id.* at 470-71.

Thus, the primary issue in *Dotson* was not *how* to apply *Belenski*, but whether *Belenski* applied at all. *Dotson* concluded that it did and held that the closing letter triggered the limitations period because it was "'was sufficient' to put

Dotson 'on notice that the County did not intend to disclose records or further address [the] request.'" *Id.* at 471 n.7 (alteration in original) (quoting *Belenski*, 186 Wn.2d at 461). We denied review in *Dotson*, so this our first opportunity to interpret and apply its holdings.

Both parties, the trial court, the Court of Appeals, and amici supporting Cousins[7] all appear to interpret *Dotson* to impose an "extratextual 'bright line rule' under which the statute of limitations on a PRA claim begins to run as soon as the agency sends a letter asserting the request is 'closed.'" Amicus Curiae Br. of Am. Civ. Liberties Union of Wash. et al., at 2; *see also* CP at 1802; *Cousins*, 25 Wn. App. 2d at 491-93; Suppl. Br. of Pet'r at 15-16; Suppl. Br. of DOC at 17-18. DOC supports this bright-line rule, arguing that the statute of limitations started running in this case with the January 2019 closing letter. *See* Suppl. Br. of DOC at 18 (citing *Dotson*, 13 Wn. App. 2d at 470-72). Cousins argues that *Dotson*'s alleged bright-line rule should be rejected because it "bestows preclusive effect on something called a 'closing letter,' a term that is found nowhere in the statute or regulations, even where the agency subsequently produces additional documents." Am. Pet. for Discr. Rev. at 16. The parties' arguments on this point are misplaced.

No language in *Dotson* sets forth a bright-line rule that the PRA's limitations period is always triggered by every purported "closing letter." Instead, *Dotson*

---

[7] Amici supporting DOC do not address *Dotson*.

explicitly considered the particular "closing language chosen by the [agency]" in that case, as well as the requester's failure to ask follow-up "questions regarding the produced records or amend her PRA request." 13 Wn. App. 2d at 471, 462. In doing so, *Dotson* correctly made a case-specific holding by properly applying *Belenski*'s final, definitive response test to the particular facts presented. *Dotson* does not purport to adopt a bright-line rule for all closing letters in all cases, and we decline to interpret it in that way.

Indeed, if *Dotson* had adopted a bright-line rule that an agency's use of the word "closed" will always trigger the PRA's statute of limitations, we would reject it. As discussed further below, such a rule would improperly prioritize finality for agencies over all other relevant interests, including certainty for requesters and the PRA's strong mandate for broad public disclosure. Our opinions in *Rental Housing* and *Belenski* require a more balanced approach, and we interpret *Dotson* in accord with this precedent.

Thus, we clarify that *Dotson* did not adopt a bright-line rule but, instead, properly reached a case-specific result by applying *Belenski* to the particular facts presented. *Dotson*'s analysis supports the following propositions: (1) *Belenski*'s final, definitive response test applies in all PRA cases, (2) a sufficient closing letter can satisfy the final, definitive response test, and (3) following a sufficient closing

letter, the production of additional records does not ordinarily restart the limitations period. We now expressly adopt each of these holdings.

3. Subject to equitable tolling, a sufficient closing letter will trigger the PRA's limitations period, even if additional records are later produced

Having reviewed the principles established by *Rental Housing*, *Belenski*, and *Dotson*, we now address the proper analytical framework to determine whether a closing letter is sufficient to trigger the PRA's one-year statute of limitations. We reaffirm *Belenski*'s final, definitive response test, subject to equitable tolling. We further recognize that a closing letter will ordinarily trigger the limitations period if, *but only if*, the letter is objectively sufficient to satisfy the final, definitive response test. The subsequent production of records may be relevant to liability or penalties but will generally not restart the limitations period.

a. The limitations period for all PRA actions is determined in accordance with *Belenski*'s final, definitive response test

As discussed above, *Belenski* suggested in dicta that the final, definitive response test should apply in all PRA actions because it would be "absurd" to apply different statutes of limitations "based on how the agency responded." 186 Wn.2d at 460-61. *Dotson* agreed, rejecting the requester's argument that *Belenski* "controls only where RCW 42.56.550(6) does not clearly apply, or in cases where the responding agency claimed it had no records." 13 Wn. App. 2d at 471. We

now affirm that *Belenski*'s final, definitive response test provides the applicable

framework for measuring the statute of limitations in all PRA actions.

Cousins does not ask this court to overrule or limit *Belenski*. However, she

argues that the limitations period for her PRA action should be measured from

"'*the last production of a record* on a partial or installment basis'" based on "[t]he

plain language of RCW 42.56.550(6)." Am. Pet. for Discr. Rev. at 14 (quoting

RCW 42.56.550(6)). In Cousins' view, this occurred when DOC produced

Installment 17 in August 2021. Therefore, Cousins argues, DOC's prior closing

letters from January 2019 and June 2021 should be disregarded as "incorrect and

legally meaningless." *Id.* at 16. We disagree with Cousins on this point.

In essence, Cousins argues that an agency response that *is* listed in the

statute automatically supersedes an agency response that is *not* listed in the

statute—regardless of which one occurred first. *Dotson* explicitly rejected this

interpretation, and correctly so, because it is inconsistent with the analysis set forth

in *Belenski*. *See* 13 Wn. App. 2d at 471-72.

It is certainly true that "[w]here the meaning of statutory language is plain

on its face, we must give effect to that plain meaning as an expression of

legislative intent." *Rental Hous.*, 165 Wn.2d at 536. However, we do not read

specific statutory phrases in isolation. Instead, we must "look at the [PRA] in its

entirety in order to enforce the law's overall purpose," taking guidance from prior case law interpreting the same statutory language. *Id.*

As discussed above, our case law recognizes that the PRA's broad public disclosure mandate must be balanced with the "valuable purposes" served by the statute of limitations, including "certainty and finality, and protecting against stale claims." *Id.* at 540. We recognized in *Belenski* that the proper balance can be achieved only by reading the two types of agency responses listed in RCW 42.56.550(6) as illustrative rather than "a definitive list." 186 Wn.2d at 460.

As a result, *Belenski* does not distinguish between agency responses based on whether they fit within the statutory examples. To the contrary, "the legislature intended to impose a one year statute of limitations beginning on an agency's final, definitive response to a public records request . . . for *all* possible responses under the PRA." *Id.* (emphasis added). Regardless of the type of response an agency gives, the inquiry remains the same: When did the agency provide a final, definitive response "sufficient to put [the requester] on notice that the [agency] did not intend to disclose records or further address this request"? *Id.* at 461.

*Belenski*'s reasoning is firmly grounded in the plain language of the statute, which "does not use terms like 'either' or 'only' to limit the triggering events." *Id.* at 460. Moreover, *Belenski* properly recognizes that the legislature does not intend to create "absurd results—leaving either no statute of limitations or a different

statute of limitations to apply based on how the agency responded." *Id.* at 460-61.

In addition, the legislature has not amended the statute in the years since *Belenski*

was decided, strongly indicating that our interpretation was consistent with

legislative intent. *See State v. Blake*, 197 Wn.2d 170, 190-92, 481 P.3d 521 (2021)

(discussing principles of legislative acquiescence).

Thus, we reaffirm that the legislature intended to create a single, uniformly

applicable standard for measuring when the statute of limitations has started to run

in a PRA action. The correct standard is *Belenski*'s final, definitive response test,

regardless of whether an agency's response fits within the examples listed in RCW

42.56.550(6). Cousins' approach would improperly elevate the statute's

illustrative examples above other types of agency responses, undermining the

uniform application of *Belenski* and limiting agencies' flexibility to respond in a

manner appropriate to the specific PRA request at issue. Therefore, we decline to

adopt Cousins' approach and, instead, we apply the final, definitive response test.

    b. A *sufficient* closing letter ordinarily satisfies the final, definitive
      response test

*Belenski* holds that an agency's final, definitive response to a PRA request

need not conform to the types of responses explicitly listed in RCW 42.56.550(6)

in order to trigger the limitations period. However, to constitute a final, definitive

response, the agency's response must be objectively sufficient to put a reasonable,

nonattorney requester on notice that the one-year limitations period has started to

run because the agency does not intend to disclose additional records or further address the request. 186 Wn.2d at 461. It is clear that a sufficient closing letter can, and usually will, meet this standard. Nevertheless, an agency's use of the word "closed," without more, is not determinative. When assessing the sufficiency of closing letters, courts and agencies should consult the attorney general's Advisory Model Rules and the guidance in today's opinion.

Preliminarily, Cousins appears to argue that closing letters should rarely, if ever, trigger the PRA's statute of limitations. She correctly points out that the PRA does not explicitly address closing letters and that the word "closed" is not defined within the PRA. *See* Am. Pet. for Discr. Rev. at 16; RCW 42.56.010 (definitions). However, the attorney general's Advisory Model Rules have explicitly encouraged the use of closing letters for nearly 20 years. *See* WAC 44-14-04006, -04007; Wash. St. Reg. 06-04-079.

The Advisory Model Rules provide that a request "can be closed" by an agency only when the request "has been fulfilled." WAC 44-14-04006(1). Fulfillment may occur in a number of ways:

> [W]hen a requestor has inspected all the requested records, all copies have been provided, a web link has been provided (with assistance from the agency in finding it, if necessary), an entirely unclear request has not been clarified, a request or installment has not been claimed or reviewed, or the requestor cancels the request.

35

*Id.* When a request is fulfilled, the agency "should provide a closing letter stating the scope of the request and memorializing the outcome," including an explanation of how the request was fulfilled (inspection, providing copies, etc.). *Id.* "The closing letter should also ask the requestor to promptly contact the agency if [they] believe[ ] additional responsive records have not been provided." *Id.* When the closure process is complete, "[a]n agency has no obligation to search for records," although the agency should provide any "later-discovered records to the requestor." WAC 44-14-04007.

The Advisory Model Rules are not binding, but the legislature has clearly expressed its intent for agencies and courts to consult the Advisory Model Rules when interpreting the PRA. *See* RCW 42.56.570; *Kilduff v. San Juan County*, 194 Wn.2d 859, 872-73, 453 P.3d 719 (2019); *Rental Hous.*, 165 Wn.2d at 539; *Cantu v. Yakima Sch. Dist. No. 7*, 23 Wn. App. 2d 57, 91 & n.10, 514 P.3d 661 (2022). Therefore, we must conclude that the use of closing letters in accordance with the Advisory Model Rules is consistent with legislative intent, and we reject Cousins' suggestion that closing letters are inherently suspect.

At the same time, we reject any bright-line rule giving determinative effect to the word "closed." An experienced public records specialist or judicial officer might automatically understand the word "closed" as a legal term of art, meaning "that the agency no longer intends to disclose additional records or further address

36

a request." *Cousins*, 25 Wn. App. 2d at 493. However, agencies and courts cannot assume that a requester has, or should have, the same understanding.

A person need not have any training in the law or the PRA to request public records from an agency, and every person who makes a PRA request is entitled to "the fullest assistance . . . and the most timely possible action." RCW 42.56.100. A bright-line rule giving determinative effect to the word "closed" would undermine the PRA's "'central tenets'" to preserve "'the accountability to the people of public officials and institutions.'" *Wade's Eastside Gun Shop, Inc. v. Dep't of Lab. & Indus.*, 185 Wn.2d 270, 277, 372 P.3d 97 (2016) (quoting *Progressive Animal Welfare Soc'y*, 125 Wn.2d at 251, and citing RCW 42.56.030). We "must avoid interpreting the PRA in a way that would tend to frustrate that purpose." *Worthington v. WestNET*, 182 Wn.2d 500, 507, 341 P.3d 995 (2015).

Moreover, as discussed above, *Belenski* requires a consistent, uniform approach to triggering the statute of limitations "for all possible responses under the PRA." 186 Wn.2d at 460. Such consistency is necessary to preserve the "valuable purpose" of "certainty and finality" reflected in the statute of limitations. *Rental Hous.*, 165 Wn.2d at 540. The only way for courts to consistently apply *Belenski*, without putting nonattorneys at a disadvantage, is to conduct an objective inquiry assuming that the requester is a lay person with no specialized knowledge or expertise.

Indeed, although we largely affirm *Dotson*, as discussed above, we must correct a portion of its analysis suggesting that *Belenski* imposes a subjective inquiry. In deciding whether the agency's closing letter was a final, definitive response, *Dotson* addressed the requester's "concerns of 'gamesmanship'" and what the agency "intended" for the letter to mean. 13 Wn. App. 2d at 471. An agency's subjective intent, like a requester's subjective understanding, is irrelevant to *Belenski*'s final, definitive response test. Subjective intent affects some issues that may arise in a PRA action, including equitable tolling and statutory penalties, but those are separate issues that should not be conflated with the objective inquiry required by *Belenski*. *See Fowler v. Guerin*, 200 Wn.2d 110, 121, 515 P.3d 502 (2022) (equitable tolling); *Neigh. All. of Spokane County v. Spokane County*, 172 Wn.2d 702, 717, 261 P.3d 119 (2011) (penalties).

In sum, we hold that a sufficient closing letter will ordinarily trigger the PRA's one-year statute of limitations pursuant to *Belenski*'s final, definitive response test. In accordance with the attorney general's Advisory Model Rules, agencies must refrain from closing a request until the request has been fulfilled pursuant to applicable regulations. *See* WAC 44-14-04006(1). When the agency has a good faith belief that a PRA request is subject to closure, the agency may satisfy *Belenski*'s final, definitive response test with a sufficient closing letter.

Sufficient closing letters must be written in plain language targeted to a lay audience and should include at least the following information: (1) how the PRA request was fulfilled and why the agency is now closing the request, (2) that the PRA's one-year statute of limitations to seek judicial review has started to run because the agency does not intend to further address the request, and (3) that the requester may ask follow-up questions within a reasonable time frame, which may be explicitly specified by the agency.

If the requester asks timely follow-up questions, the agency is not required to search for additional records, although it may choose to do so. However, if the requester asks timely follow-up questions and the agency does not intend to further address the request, the agency should explicitly say so and reiterate that the statute of limitations has started to run. An insufficient or premature closing letter may not trigger the statute of limitations, or it may provide a basis for equitable tolling, depending on the particular circumstances presented.

      c.     Absent equitable tolling, records produced subsequent to a sufficient closing letter do not restart the limitations period

Finally, Cousins argues that even if a closing letter *could* trigger the statute of limitations, "the subsequent production of records [means] the 'closing letter' is at best incorrect and legally meaningless, and at worst is a dishonest response from the agency." Am. Pet. for Discr. Rev. at 16. We cannot agree.

The attorney general's Advisory Model Rules are instructive on this point, providing that "[a]n agency has no obligation to search for records responsive to a closed request. Sometimes an agency discovers responsive records after a request has been closed. An agency should provide the later-discovered records to the requestor." WAC 44-14-04007. There is no indication that providing such later-discovered records restarts the PRA's statute of limitations, and we hold that it does not, unless equitable tolling applies. Contrary to Cousins' suggestion, this approach promotes full agency disclosure rather than inhibiting it.

*Dotson* provides a practical example. As explained by the Court of Appeals, "the additional records produced [in *Dotson*] were discovered accidentally in the regular course of business and in response to Dotson's summary judgment motion." *Cousins*, 25 Wn. App. 2d at 492 (citing *Dotson*, 13 Wn. App. 2d at 462-63). If producing those additional records automatically restarted the limitations period, as Cousins argues it should, agencies would clearly be discouraged from producing later-discovered records.

We must promote "a culture of compliance among agencies and a culture of cooperation among requestors," in part by encouraging agencies to "work[ ] with requesters after the agency has provided the requester with the agency's final, definitive response." WAC 44-14-00001; Br. of Amicus Submitted on Behalf of Wash. State Ass'n of Mun. Att'ys et al. 7; *see also* Suppl. Br. of DOC at 16-18.

Cousins' approach essentially treats all closing letters as contingent and subject to revocation, regardless of whether they were properly issued in the first instance. This would undermine cooperative efforts and eliminate much of the certainty and finality the PRA's statute of limitations is meant to promote.

Where an agency issues a sufficient closing letter but subsequently produces additional responsive records, the subsequent production may be relevant to assessing the agency's liability and penalties, as well as equitable tolling in appropriate cases. However, the subsequent production will not ordinarily restart the limitations period.

In sum, we reaffirm *Belenski*'s final, definitive response test. A sufficient closing letter in accordance with the Advisory Model Rules will ordinarily satisfy *Belenski*, even if the agency subsequently produces additional responsive records. We must now consider the record presented in this case to determine when DOC provided its final, definitive response to Cousins' PRA request.

B.      Cousins' PRA action is not barred by the statute of limitations because the June 2021 closing letter was DOC's final, definitive response

In this case, DOC argues that its January 2019 closing letter was the final, definitive response to Cousins' PRA request. Cousins argues that neither of DOC's closing letters was a final, definitive response, so the limitations period did not start to run until DOC produced Installment 17 in August 2021. We disagree with both parties and hold that DOC's June 2021 closing letter was its final,

definitive response to Cousins' PRA request.  Therefore, her January 2021 PRA action is not barred by the statute of limitations.

As discussed, the sufficiency of a closing letter should be assessed in accordance with the guidance provided by today's opinion and the attorney general's Advisory Model Rules.  Of course, today's opinion was not available to DOC while it was processing Cousins' PRA request.  Therefore, it is not surprising that neither of the closing letters DOC sent to Cousins in January 2019 and June 2021 strictly complies with the standards set forth in today's opinion.  However, this fact is not determinative, as we do not claim to impose a retroactive standard of strict compliance.

Indeed, such an approach would be entirely inconsistent with the balanced, functional approach taken by our precedent, as discussed above.  *See Rental Hous.*, 165 Wn.2d at 538 (analyzing whether refusal letter *functioned* as a claim of exemption by "includ[ing] the sort of 'identifying information' a privilege log provides"); *Belenski*, 186 Wn.2d at 461 (analyzing whether response *functioned* as a final, definitive response "to put [the requester] on notice that the [agency] did not intend to disclose records or further address this request").  Therefore, we must determine whether the January 2019 or June 2021 closing letters functioned as a final, definitive response by sufficiently putting Cousins on notice that DOC did not intend to produce additional records or further address her request.  As

discussed above, the sufficiency of a closing letter must be considered objectively, applying the standard of a reasonable lay person.[8]

DOC argues, and the trial court and Court of Appeals agreed, that the January 2019 closing letter was DOC's final, definitive response to Cousins' PRA request. However, as discussed above, this was based on the mistaken view that *Dotson* establishes a bright-line rule that *all* purported "closing letters" satisfy the final, definitive response test. Instead, as clarified in today's opinion, *Doston* held that the *specific* closing letter in that case was sufficient. Here, the closing letter DOC sent to Cousins in January 2019 was not sufficient.

Contrary to the Advisory Model Rules, and unlike the closing letter in *Dotson*, DOC's January 2019 closing letter simply stated that Cousins' request was "closed," without explaining what that meant or why the request had been closed. CP at 44. *Contra* WAC 44-14-04006(1); *Dotson*, 13 Wn. App. 2d at 461 (closing letter explaining that the requester had "'received responsive documents'"). We emphasize again that although the word "closed" may be familiar to courts and agencies as a term of art, it is not defined in the PRA, and it may not hold any legal

---

[8] At the trial court, DOC sought a "credibility determination[ ]" that Cousins did *not* subjectively believe her request was still open following the January 2019 closing letter based on her alleged "experience submitt[ing] PRA requests." CP at 1743. Such a determination may be relevant to other issues in this case, which are not before us, but it is irrelevant to the objective inquiry required by *Belenski*'s final, definitive response test.

significance to a reasonable lay person. Therefore, DOC's use of the word "closed," in itself, was not sufficient to trigger the statute of limitations.

Nevertheless, the January 2019 closing letter properly invited Cousins to ask follow-up questions. CP at 44; *cf.* WAC 44-14-04006(1); *Dotson*, 13 Wn. App. 2d at 462. With this added language, the January 2019 closing letter was sufficient to put a reasonable, nonattorney requester on notice that DOC would not further address the PRA request, *unless they had additional questions*.

Cousins did have additional questions pertaining to (1) medical and chemical dependency records and (2) the allegedly missing records she had identified in May 2017. *Contra Dotson*, 13 Wn. App. 2d at 462 (requester asked no follow-up questions). She e-mailed DOC within five days of the January 2019 closing letter. DOC promptly answered Cousins' question about the medical and chemical dependency records but repeatedly ignored Cousins' specific questions about the allegedly missing records. This ambiguous, partial response was *not* objectively sufficient to put a reasonable lay person on notice that DOC did not intend to further address Cousins' request.

To the contrary, any reasonable person would expect DOC's final, definitive response to include *some* answer to Cousins' timely follow-up questions. Even a simple statement that "DOC does not intend to produce additional records" could provide Cousins with all the information she needed to file a PRA action. *See*

*Strickland v. Pierce County*, No. 75203-1-I, slip op. at 6 (Wash. Ct. App. Jan. 29, 2018) (unpublished) ("[T]he public records officer responded by letter that 'we have already provided you all of the records in the possession of this office.'"), https://www.courts.wa.gov/opinions/pdf/752031.pdf; *cf. Belenski*, 186 Wn.2d at 461.

However, without some kind of answer from DOC, Cousins could not know if DOC was denying her request for the allegedly missing records, or if DOC believed that the allegedly missing records did not exist, or if DOC was still in the process of locating and reviewing the allegedly missing records to be produced in a future installment. Thus, a direct answer to Cousins' timely follow-up questions—*any* answer—was necessary for Cousins to know whether there was any basis to "sue to hold [DOC] in compliance with the PRA." *Belenski*, 186 Wn.2d at 461. Because DOC chose to ignore Cousins' questions, the January 2019 closing letter did not function as its final, definitive response to her PRA request.

DOC's June 2021 closing letter was similar to the January 2019 closing letter. *See* CP at 1440. Nevertheless, under the circumstances presented here, and in light of the fact that DOC did not yet have the guidance provided in today's opinion, we conclude that the June 2021 closing letter was sufficient to satisfy *Belenski*'s final, definitive response test. By that time, Cousins had already commenced her PRA action and was represented by litigation counsel. Moreover,

Cousins did not ask any follow-up questions after receiving the June 2021 closing letter, although her litigation counsel did so, leading to the production of Installment 17. For the reasons discussed above, Installment 17 may be relevant to DOC's liability or penalties, but it did not restart the limitations period. As noted, the issue of equitable tolling is not before us in the case.

Thus, the one-year statute of limitations for Cousins' PRA action started to run with the June 2021 closing letter. Because Cousins commenced her PRA action in January 2021, the action is not barred by the statute of limitations.

C.     We reject DOC's alternative argument that Cousins' PRA action must be dismissed as premature

Finally, DOC raised an alternative argument at the trial court and the Court of Appeals, which neither court reached. DOC argued that if the limitations period did not start running until the summer of 2021, then Cousins' PRA action should be dismissed as "premature under *Hobbs v. [Wash.] State [Auditor's Off.]*, 183 Wn. App. 925, 936, 335 P.3d 1004 (2014)." Resp't's Br. at 32 (Wash. Ct. App. No. 56996-5-II (2022)); *see* CP at 97. We reject DOC's argument on this point. *See* RAP 13.7(b).[9]

---

[9] "If the Supreme Court reverses a decision of the Court of Appeals that did not consider all of the issues raised which might support that decision, the Supreme Court will either consider and decide those issues or remand the case to the Court of Appeals to decide those issues."

*Hobbs* holds that "a requester may only initiate a lawsuit to compel compliance with the PRA *after* the agency has engaged in some final action denying access to a record." 183 Wn. App. at 935-36. *Hobbs* was decided in the specific context "when a person has 'been denied an opportunity to inspect or copy a public record by an agency.'" *Id.* at 936 (quoting RCW 42.56.550(1)). As the Court of Appeals later clarified, *Hobbs* "was not addressing 'the situation where an agency completely ignores a records request for an extended period.'" *Cantu*, 23 Wn. App. 2d at 90-91 (quoting *Hobbs*, 183 Wn. App. at 937 n.6).

Here, Cousins' PRA action is based, at least in part, on DOC's alleged "intolerable delay" in responding to her PRA request, a situation not addressed in *Hobbs*. CP at 7. DOC does not distinguish between Cousins' various PRA claims, arguing that her *entire* "lawsuit [is] premature and subject to dismissal without prejudice under *Hobbs*." Resp't's Br. at 33 (Wash. Ct. App. No. 56996-5-II (2022)). *Hobbs* does not support dismissal of Cousins' entire PRA action. Therefore, we reject DOC's alternative argument.

CONCLUSION

When interpreting and applying the PRA's statute of limitations, we must balance the PRA's strong mandate for broad disclosure of public records with the interests of certainty and finality underlying all limitations periods. Although we decline to adopt a bright-line rule for all purported "closing letters," we recognize

that a *sufficient* closing letter will ordinarily satisfy *Belenski*'s final, definitive response test, thereby triggering the PRA's one-year limitations period.

To ensure their closing letters are sufficient, agencies should provide at least the following information, in plain language targeted to a lay audience: (1) how the PRA request was fulfilled and why the agency is now closing the request, (2) that the PRA's one-year statute of limitations to seek judicial review has started to run because the agency does not intend to further address the request, and (3) that the requester may ask follow-up questions within a reasonable time frame, which may be specified by the agency. If the requester asks timely follow-up questions, the agency is not required to locate additional records, although it may choose to do so. However, if the agency does not intend to further address the request, it must explicitly say so and reiterate that the PRA's one-year statute of limitations has started to run.

In this case, DOC sent a letter in January 2019 telling Cousins that her request was now closed and inviting Cousins to ask follow-up questions, which she did. DOC promptly answered one of Cousins' questions but repeatedly ignored the other. Had DOC simply answered *both* of Cousins' questions by explicitly stating that no additional records would be produced, the January 2019 closing letter might have functioned as its final, definitive response. Instead, DOC provided an ambiguous partial response that was objectively insufficient to notify Cousins that

DOC did not intend to further address her PRA request. Therefore, the January 2019 closing letter did not satisfy *Belenski*'s final, definitive response test.

DOC eventually chose to reopen Cousins' request, searched for additional records and produced multiple installments, and then issued a second closing letter in June 2021. We hold that the June 2021 closing letter was DOC's final, definitive response to Cousins' PRA request, notwithstanding DOC's subsequent production of Installment 17. These later-produced records may affect DOC's liability or penalties, but they did not restart the limitations period.

Thus, Cousins' January 2021 PRA action is not barred by the statute of limitations. We reject DOC's alternative argument that the action must be dismissed as premature, and we decline to reach Cousins' alternative argument regarding the discovery rule of accrual. We reverse the Court of Appeals and remand to the trial court for further proceedings.

Yu, J.

WE CONCUR:

González, C.J.

Gordon McCloud, J.

Johnson, J.

Montoya-Lewis, J.

Madsen, J.

Whitener, J.

Stephens, J.

Lawrence-Berrey, J.P.T.